FILED
CLERK, U.S. DISTRICT COURT

6/28/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____VAV_____ DEPUTY

1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9               FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                      March 2022 Grand Jury

11   UNITED STATES OF AMERICA,            CR   2:22-cr-00276-DSF

12            Plaintiff,                  I N D I C T M E N T

13            v.                          [18 U.S.C. § 1349: Conspiracy to
                                          Commit Wire Fraud; 18 U.S.C.
14   DAVID GILBERT SAFFRON,               § 1343: Wire Fraud; 18 U.S.C.
                                          § 371: Conspiracy to Commit
15            Defendant.                  Commodity Fraud; 18 U.S.C.
                                          § 1503(a): Obstruction of Justice;
16                                        18 U.S.C. §§ 982 and 1028 and 28
                                          U.S.C. § 2461(c): Criminal
17                                        Forfeiture]

18        The Grand Jury charges:

19                               COUNT ONE

20                          [18 U.S.C. § 1349]

21   A.   INTRODUCTORY ALLEGATIONS

22        At times relevant to this Indictment:

23        **Relevant Entities**

24        1.   Circle Society was a purported cryptocurrency investment

25   and online trading platform that was founded in or around September

26   2018 and incorporated as Circle Society Corp. ("Circle Society") in

27   October 2019 in Nevada.

28

2.    Circle Society conducted its business principally by means of a website accessible at https://circlesociety.com (the "Circle Society Website").  The Circle Society Website was accessible to the public, including to individuals within the Central District of California.

3.    The Federal Crypto Reserve was a fictitious government agency that purported to recover and return stolen cryptocurrency from victims and "educate" the public on cryptocurrency for a fee.

4.    The Commodity Futures Trading Commission ("CFTC") was an independent agency of the executive branch of the United States government.  The CFTC was responsible for regulating commodity derivatives markets in the United States.

**Relevant Individuals**

5.    Defendant DAVID GILBERT SAFFRON ("SAFFRON") was a resident of Los Angeles County, California.  Defendant SAFFRON was the Founder and Owner of Circle Society and was affiliated with several related entities, including Bitcoin Wealth Management, Omicron Trust, and Cloud9Capital.  Defendant SAFFRON held himself out as an expert computer programmer and an expert trader in various cryptocurrencies, including Bitcoin.  Through his various entities, defendant SAFFRON solicited prospective investors (hereinafter, "victim-investors") to invest with him through online communication platforms, online videos, and in-person meetings.

6.    Co-conspirator 1 ("CC-1") was a lawyer who knowingly made false representations to victim-investors to induce victim-investors to invest funds with defendant SAFFRON.

7.    Co-conspirator 2 ("CC-2"), who was known to certain victim-investors as "the Bitcoin guy," accepted at least hundreds of

thousands of dollars in funds from victim-investors on behalf of defendant SAFFRON.

8.   Co-conspirator 3 ("CC-3") was the Chief Operating Officer of a contract security company hired by defendant SAFFRON.  CC-3 established and managed bank accounts used by defendant SAFFRON and solicited potential victim-investors on behalf of defendant SAFFRON.

9.   Co-conspirator 4 ("CC-4") was the Chief Executive Officer of a fashion and media company based in Hollywood, California, who falsely represented to victim-investors that he, purportedly as the Director of the Federal Crypto Reserve, had been hired by defendant SAFFRON to investigate the purported "theft" of defendant SAFFRON's and the victim-investors' investments.

**Relevant Terms**

10.   A "cryptocurrency" was a digital currency in which transactions were verified and records were maintained by a decentralized system using cryptography, rather than a centralized authority such as a bank or government.  Like traditional fiat currency (defined below), there were multiple types of cryptocurrencies, such as Bitcoin ("BTC").

11.   The "blockchain" was a distributed public ledger that recorded incoming and outgoing cryptocurrency transactions.  The blockchain recorded, among other things, the date and time of each cryptocurrency transaction, the unique cryptocurrency addresses associated with the transaction and the sending and receiving parties, and the amount of cryptocurrency transferred.  The blockchain, however, did not identify the parties that controlled the cryptocurrency addresses involved in the transaction.

12. Cryptocurrency owners typically stored their cryptocurrency in digital "wallets," which were identified by unique electronic "addresses."

13. A "fiat currency" was a government-issued currency that was not backed by a physical commodity, such as gold or silver. U.S. Dollars, British Pounds, and Euros were examples of fiat currencies.

14. Cryptocurrencies, like Bitcoin, could be traded for various fiat currencies on numerous electronic cryptocurrency exchanges.

15. Bitcoin was a "commodity" within the meaning of Title 7, United States Code, Section 1a.

B.   OBJECT OF THE CONSPIRACY

16. Beginning by no later than in or around December 2017 and continuing until at least in or around September 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant SAFFRON conspired with CC-1, CC-2, CC-3, CC-4 and others known and unknown to the Grand Jury, to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

C.   MANNER AND MEANS OF THE CONSPIRACY

17. The object of the conspiracy was to be carried out, and was carried out, in substance, as follows:

**Overview**

18. From in or around December 2017 through at least in or around September 2021, defendant SAFFRON and his co-conspirators fraudulently promoted and solicited investments and obtained at least approximately $15,000,000 in victim-investor funds for various cryptocurrency trading programs. Defendant SAFFRON and his co-conspirators falsely represented to victim-investors that defendant SAFFRON traded investors' funds to earn profits, including through

4

investment vehicles such as Circle Society, Bitcoin Wealth Management, and the Omicron Trust, among other entities.

19.   To lull the victim-investors and create the appearance of wealth and success, defendant SAFFRON would host events for prospective investors at luxury homes in the Hollywood Hills, dinners at high-end restaurants, and travel with a team of armed security guards.

20.   Defendant SAFFRON would falsely represent to victim-investors that he had personally developed and employed an Artificial Intelligence ("AI") trading robot (an "AI trading bot") that would execute 17,500 transactions per hour on various cryptocurrency exchanges.

21.   Defendant SAFFRON would falsely represent to victim-investors that the AI trading bot would buy and sell various cryptocurrencies in exchange for one or more fiat currencies as the exchange rates fluctuated up and down.

22.   Defendant SAFFRON would falsely represent to victim-investors that his AI trading bot used "signaling technology" that analyzed news reports, market reports, and "social media sentiment" related to all of the stock exchanges and crypto exchanges around the world.

23.   Defendant SAFFRON would falsely represent to victim-investors that the AI trading bot would regularly generate between 500% to 600% returns on the amount invested.

24.   Defendant SAFFRON would falsely represent to victim-investors that he "guaranteed" returns of 150% - 300% that would be paid to investors within 30 days after the initial investment, and he

would keep any excess profits above that amount for his own compensation.

25.   But defendant SAFFRON did not trade cryptocurrency with victim-investors' funds to generate profits.  In fact, defendant SAFFRON was operating an illegal Ponzi scheme to defraud victim-investors and to take and use the funds for his own personal benefit.

26.   Defendant SAFFRON would make numerous false representations to victim-investors to induce them to invest cash or cryptocurrency in defendant SAFFRON's cryptocurrency Ponzi scheme, including that defendant SAFFRON:

     a.   Was a computer programmer who was the lead developer for the Uber App and Snapchat App;

     b.   Wrote the security software used by most U.S. banks;

     c.   Developed an AI trading bot that was as advanced as IBM's AI "Watson," which was known for defeating reigning champions on the TV gameshow Jeopardy;

     d.   Had perfected the programing of his AI trading bot to execute profitable trades 76 percent of the time; and

     e.   Had a series-7 securities broker's license.

     **Fraudulent "Tests" of Trading Programs to Deceive Victim-Investors**

27.   Defendant SAFFRON would falsely represent to victim-investors that they could "test out" his trading program to assure themselves that he truly could deliver 150% to 300% returns.

28.   On multiple occasions, defendant SAFFRON made a sales pitch to a new group of potential victim-investors in which he promised 150% - 300% returns, and defendant SAFFRON would offer one or a few potential investors from the larger group the opportunity to invest a

6

small amount of cash or cryptocurrency, usually only a few hundred dollars to a few thousand dollars, to "test" whether defendant SAFFRON's AI trading bot could deliver the promised returns of 150% - 300%.

29.  Defendant SAFFRON offered to run this "test" over the course 20 to 30 minutes, a few hours, or over a few days.

30.  After the agreed "test" period was complete, defendant SAFFRON deceived the larger group of potential investors by paying "returns" of 150% to 300% to the small group of investors who had participated in the "test."  The "returns" were actually Ponzi payments that defendant SAFFRON made using other victim-investors' funds.

31.  Defendant SAFFRON used the funds from early victim-investors to pay the purported returns to the new prospective investors because defendant SAFFRON did not actually have an AI trading bot and did not trade investors' funds on exchanges.

32.  Upon the completion of the fraudulent "test," many victim-investors invested the equivalent of between tens and hundreds of thousands of dollars in defendant SAFFRON's fraudulent Ponzi scheme

**Repeated False Representations about Defendant SAFFRON's Failure to Pay the Promised Returns**

33.  Once victim-investors had sent funds or cryptocurrency to defendant SAFFRON, defendant SAFFRON would falsely represent to victim-investors that the investments were growing, and defendant SAFFRON would encourage victim-investors to "roll" or reinvest "profits" purportedly earned from defendant SAFFRON's AI trading bot back into defendant SAFFRON's trading programs rather than withdrawing them.

34.   But, in fact, there were no profits because defendant SAFFRON did not have an AI trading bot and did not trade the victim-investors' funds to generate profits for the victim-investors. Instead, defendant SAFFRON kept the funds for his own personal use and benefit.

35.   When the victim-investors began to demand the return of their initial investment and the profits that defendant SAFFRON had promised, defendant SAFFRON would make various false representations about the reason he could not repay investors until some later time, including, but not limited to:

a.   That a "solar flare" required defendant SAFFRON to suspend payments and shutdown his website for a period of days;

b.   That there were too many unverified transactions on the Bitcoin blockchain, which required defendant SAFFRON to suspend payments to victim-investors;

c.   That repayments would be suspended for approximately one week because the Bitcoin blockchain limited the number of transactions that defendant SAFFRON's cryptocurrency wallet could have pending at any one time;

d.   That defendant SAFFRON had not responded to requests from victim-investors because he had suffered a head injury and had to be put into a medically induced coma for five days, when defendant SAFFRON had actually been unable to communicate with victim-investors because he was in police custody;

e.   That several of defendant SAFFRON's investors clicked the payout button more than 20 times, thus "locking" defendant SAFFRON's cryptocurrency wallet for 24 to 36 hours; and

       f.   That payouts to investors would be suspended for approximately one month while defendant SAFFRON's website underwent "site maintenance."

36.  As another method to avoid victim-investors' demands for repayment, defendant SAFFRON would solicit the public to invest in cryptocurrency trading programs purportedly managed by a third party that was independent from defendant SAFFRON.

37.  Cloud9Capital was one such allegedly independent third-party cryptocurrency investment plan in which defendant SAFFRON solicited investments.  To induce their investment, defendant SAFFRON falsely represented to potential investors that defendant SAFFRON had invested more than 200 of his own Bitcoin in Cloud9Capital.  But, in fact, defendant SAFFRON controlled the Cloud9Capital cryptocurrency wallet address, and defendant SAFFRON used Cloud9Capital as part of a scheme to defraud investors and misappropriate investors' funds for defendant SAFFRON's personal benefit.

38.  When the Cloud9Capital site would not honor victim-investors' demands to receive their initial investment and profits back, defendant SAFFRON would conceal his control of the Cloud9Capital cryptocurrency wallet and deflect any responsibility by falsely representing that he too had lost his own investment in Cloud9Capital.

39.  In furtherance of the conspiracy:

       a.   Defendant SAFFRON, CC-1, CC-2, CC-3, and CC-4, together with other conspirators, would make materially false statements to victim-investors regarding the high-yield returns that would purportedly result from investing in defendant SAFFRON's cryptocurrency trading programs;

b.     Defendant SAFFRON, CC-1, CC-2, CC-3, and CC-4, together with other conspirators, would make materially false statements to victim-investors regarding the use of invested funds, falsely representing that funds would be used to trade cryptocurrency and fiat currency to generate profits for investors;

c.     Defendant SAFFRON, CC-1, CC-2, CC-3, and CC-4, together with other conspirators, would make material omissions to victim-investors regarding how investors' funds would be used, omitting that funds would be used to personally enrich defendant SAFFRON, CC-1, CC-2, CC-3, and CC-4, and other conspirators;

d.     Defendant SAFFRON, CC-1, CC-2, CC-3, and CC-4, together with other conspirators, by and through the co-conspirators' scheme to defraud victim-investors of money and other property, including cryptocurrency, by means of fraudulent pretenses, false representations, and false promises, would induce victim-investors to transmit, and cause to be transmitted, funds and cryptocurrency by means of interstate wires; and

e.     Defendant SAFFRON, CC-1, CC-2, CC-3, and CC-4, together with other conspirators, would make materially false statements to victim-investors who had already invested and had not been repaid as promised, and to potential victim-investors, to conceal the scheme from the victim-investors and the potential victim-investors, and to induce victims to invest in the scheme again.

D.   OVERT ACTS

40.   On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendant SAFFRON, together with CC-1, CC-2, CC-3, and CC-4, and other conspirators, committed

and knowingly caused others to commit the following overt acts, among others, within the Central District of California, and elsewhere:

Overt Act No. 1:   In December 2017, defendant SAFFRON conducted an in-person meeting with prospective investors in Los Angeles County, during which defendant SAFFRON falsely represented to investor H.C. that defendant SAFFRON guaranteed a 150% to 200% return, depending on the amount invested, and returns would be paid at the end of 30 days with no risk of loss.

Overt Act No. 2:   On January 21, 2018, CC-1 provided a letter to investor H.C. on letterhead from CC-1's Los Angeles-based law firm stating that CC-1 had unrestricted access to one of defendant SAFFRON's cryptocurrency wallets.   CC-1 falsely represented that the wallet held 1,000 Bitcoin.   On or about January 21, 2018, the market price for 1,000 Bitcoin was more than $11.6 million.   To induce H.C. to invest, CC-1 falsely represented that the 1,000 Bitcoin in the cryptocurrency wallet would be used to ensure that H.C.'s initial investment would be returned in the event defendant SAFFRON was unable or unwilling to return the initial investment.

Overt Act No. 3:   On June 19, 2018, CC-2 solicited and induced investor victim E.U., a Los Angeles County resident, to wire $432,000 U.S. dollars to a bank account under CC-2's control in exchange for 65 Bitcoin.   CC-2 knew that E.U. intended to invest the 65 Bitcoin in one of defendant SAFFRON's fraudulent trading programs known as the Circle Society, Corp.

Overt Act No. 4:   On June 20, 2018, instead of sending the 65 Bitcoin to a cryptocurrency wallet controlled by investor E.U., CC-2 transferred the $432,000 to defendant SAFFRON via wire transfer.

Overt Act No. 5:   On June 20, 2018, defendant SAFFRON falsely represented on Circle Society's account website that 65 Bitcoin had been "credited" to E.U.'s account.

Overt Act No. 6:   On August 2, 2018, defendant SAFFRON negotiated, by and through other conspirators, an agreement with a registered investment advisor located in Los Angeles, California, pursuant to which defendant SAFFRON would receive $5 million U.S. dollars in exchange for an amount of Bitcoin of equal value.  The agreement documentation provided instructions for the investment advisor to wire the $5 million to CC-2's lawyer trust bank account.

Overt Act No. 7:   On August 8, 2018, upon learning that the $5 million sale might not go through because the investment advisor's due diligence identified websites accusing defendant SAFFRON of operating a Ponzi scheme, CC-3 knowingly made false representations to the investment advisor to induce the investment advisor to go through with the transaction.  Specifically, CC-3 falsely represented that CC-3's contract security firm had vetted defendant SAFFRON, verified the source of defendant SAFFRON's Bitcoin, and understood how defendant SAFFRON worked with Bitcoin and cryptocurrencies to produce considerable returns.  CC-3 also falsely represented that defendant SAFFRON was not involved in any type of criminal activity because the security firm's investigators would have found any such criminal activity.

Overt Act No. 8:   On September 16, 2020, defendant SAFFRON solicited victim investor S.B. to invest in Cloud9Capital, a Bitcoin wealth-management fund that defendant SAFFRON falsely represented was operated by a third party.  Defendant SAFFRON induced S.B. to invest, in part, by falsely representing that defendant SAFFRON had

personally invested more than 200 of his own Bitcoin in Cloud9Capital.   Defendant SAFFRON concealed from S.B. that defendant SAFFRON controlled the Cloud9Capital cryptocurrency wallet address and was using Cloud9Capital to defraud S.B.   Thereafter, defendant SAFFRON maintained to S.B. that defendant SAFFRON was not responsible for Cloud9Capital's failure to repay the initial investment or profits.

Overt Act No. 9:   On November 19, 2020, defendant SAFFRON encouraged victim-investor S.B. to obtain a membership with the "Federal Crypto Reserve," which defendant SAFFRON falsely represented he had hired to "investigate" Cloud9Capital.

Overt Act No. 10:   On November 27, 2020, CC-4 sent an email to victim-investor S.B. that solicited S.B. to pay Bitcoin to join the Federal Crypto Reserve.  CC-4 falsely represented that defendant SAFFRON had already initiated a Federal Crypto Reserve investigation into Cloud9Capital along with two other Cloud9Capital investors.  CC-4 also falsely represented that the Federal Crypto Reserve had already found "lots of information" on Cloud9Capital, but CC-4 could not share the information with S.B. until S.B. joined the Federal Crypto Reserve as a paid platinum member.

COUNTS TWO THROUGH FIVE

[18 U.S.C. §§ 1343, 2(a)]

41.   The Grand Jury re-alleges paragraphs 1 through 15 and 17 through 40 here.

A.   THE SCHEME TO DEFRAUD

42.   Beginning by no later than in or around December 2017 and continuing until at least in or around September 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant SAFFRON, CC-1, CC-2, CC-3, CC-4, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud victim-investors as to material matters, and to obtain moneys, funds, assets, and other property from such victim-investors by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

43.   The fraudulent scheme operated and was carried out, in substance, as described in paragraphs 17 through 40 of this Indictment.

B.   USE OF THE WIRES

44.   On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, for the purpose of executing the above-described scheme to defraud, defendant SAFFRON, together with others known and unknown to the Grand Jury, aiding and abetting each other, transmitted and caused the transmission of the following items by means of wire and radio communication in interstate and foreign commerce:

14

| COUNT | DATE | INTERSTATE WIRE TRANSMISSION |
|-------|------|------------------------------|
| TWO | June 19, 2018 | Interstate bank wire of $462,000 initiated from Los Angeles County by victim investor E.U. from account x0961 at Bank A to account x6966 controlled by CC-2 at Bank B. |
| THREE | August 17, 2018 | Interstate wire of 3.00009348 BTC (approximately $19,736.11 USD) initiated from Orange County by victim investor S.F. to a cryptocurrency wallet controlled by defendant SAFFRON. |
| FOUR | November 1, 2018 | Interstate wire of 1.0000 BTC (approximately $6,308.02 USD) initiated from Los Angeles County by victim investor S.H. to a cryptocurrency wallet controlled by defendant SAFFRON. |
| FIVE | September 16, 2020 | Interstate wire of 4.00001979 BTC (approximately $44,024.49 USD) initiated from Los Angeles County by victim investor S.B. to a cryptocurrency wallet controlled by defendant SAFFRON. |

COUNT SIX

[18 U.S.C. § 371]

45.   The Grand Jury re-alleges paragraphs 1 through 15 and 17 through 40 here.

A.   THE OBJECT OF THE CONSPIRACY

46.   Beginning by no later than in or around December 2017 and continuing until at least in or around September 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant SAFFRON conspired with CC-1, CC-2, CC-3, CC-4, and with others known and unknown to the Grand Jury, to employ a manipulative scheme to defraud in connection with the purchase or sale of Bitcoin, each purchase or sale being a contract of sale of a commodity in interstate commerce, in violation of Title 7, United States Code, Section 9(1), and in violation of Title 17, Code of Federal Regulations, Section 180.1(a).

B.   MANNER AND MEANS OF THE CONSPIRACY

47.   The object of the conspiracy was to be carried out, and was carried out, in substance, as described in paragraphs 17 through 39 of this Indictment.

C.   OVERT ACTS

48.   In furtherance of the conspiracy and to accomplish its object, defendant SAFFRON, together with CC-1, CC-2, CC-3, and CC-4, and other conspirators, committed and knowingly caused others to commit the overt acts described in paragraph 40 of this Indictment, among others, within the Central District of California, and elsewhere.

COUNT SEVEN

[18 U.S.C. § 1503(a)]

A.   INTRODUCTORY ALLEGATIONS

49.   The Grand Jury re-alleges paragraphs 1 through 15 and 17 through 39 of this Indictment here.

50.   At times relevant to this Indictment, a "commodity pool" was any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading commodity interests, including option contracts on commodities, such as cryptocurrencies and fiat currencies, as defined in Title 7, United States Code, Section 1a.

51.   On or about September 30, 2019, the CFTC, a United States federal agency, filed a complaint against defendant SAFFRON and Circle Society, Corp., styled CFTC v. David Gilbert Saffron and Circle Society, Corp., No. 2:19-cv-01697, (D. Nev. Sept. 30, 2019) in the U.S. District Court for the District of Nevada.

52.   The CFTC's complaint alleged that defendant SAFFRON had accepted at least $11 million worth of Bitcoin and U.S. dollars from members of the public to trade options contracts on various cryptocurrencies and fiat currencies through defendant SAFFRON's unregistered commodity pool.

53.   The CFTC's complaint alleged that, rather than trade investors' funds in options contracts as promised, defendant SAFFRON defrauded the investors and misappropriated the funds for defendant SAFFRON's personal use and benefit.

54.   On or about December 6, 2019, the Nevada U.S. District Court entered a Preliminary Injunction Order enjoining defendant SAFFRON from:

17

a.   "soliciting or accepting funds from members of the public for the purpose of participating in a commodity pool operated by, for, or on behalf of Saffron or Circle Society," and

b.   "trading, directly or indirectly, in any commodity that is regulated under the [Commodity Exchange] Act."

55.   On or about January 24, 2020, defendant SAFFRON received actual notice of the December 6, 2019, Preliminary Injunction Order at a hearing on the record in Nevada U.S. District Court, in which the court provided defendant SAFFRON with a copy of the Preliminary Injunction Order and directed defendant SAFFRON to familiarize himself with its terms.

B.   OBSTRUCTION OF JUSTICE

56.   Beginning by at least in or around July 2020, and continuing through at least September 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendant SAFFRON corruptly obstructed, impeded, and endeavored to obstruct and impede the due administration of justice, by repeatedly violating the Nevada U.S. District Court's Preliminary Injunction Order by knowingly defrauding investors through soliciting and accepting funds for trading in Bitcoin, as described below.

57.   In or around July 2020, defendant SAFFRON was introduced to victim-investor S.B., a resident of Los Angeles County, California.

58.   At all times relevant to this Indictment, defendant SAFFRON's communications, meetings, and interactions with S.B. occurred while investor S.B. was in Los Angeles County, California.

59.   On or about July 28, 2020, defendant SAFFRON represented to S.B. that defendant SAFFRON ran a Bitcoin fund.

60.   On or about August 9, 2020, S.B. agreed to accept fourteen (14) Bitcoin from defendant SAFFRON in exchange for $140,000 in services rendered by S.B.'s business to defendant SAFFRON.  Defendant SAFFRON promised to pay the 14 Bitcoin after services were rendered, but defendant SAFFRON never paid S.B.

61.   On or about September 16, 2020, defendant SAFFRON solicited S.B. to invest in Cloud9Capital, a Bitcoin wealth-management fund.

62.   Defendant SAFFRON falsely represented to S.B. that defendant SAFFRON had over 200 Bitcoin invested in Cloud9Capital, when in fact defendant SAFFRON controlled the Cloud9Capital cryptocurrency wallet address, and defendant SAFFRON used Cloud9Capital as part of a scheme to defraud investors and misappropriate investors' funds for defendant SAFFRON's personal benefit.

63.   Based on defendant SAFFRON's solicitations for funds, and in reliance on defendant SAFFRON's false representations, on or about September 16, 2020, S.B. transferred 4.00001979 Bitcoin (approximately $44,024.19) to the Cloud9Capital cryptocurrency wallet controlled by defendant SAFFRON.

64.   Defendant SAFFRON represented to S.B. on or about September 19, 2020, that defendant SAFFRON personally managed funds for eleven (11) clients, each client having a minimum investment of 5,500 Bitcoin.

65.   On or about September 19, 2020, defendant SAFFRON solicited S.B. to invest in the 11-client fund managed by defendant SAFFRON. Defendant SAFFRON falsely represented to S.B. that for a minimum 100 Bitcoin investment, defendant SAFFRON could pay returns of 50% in 140 days.

66.   On or about September 19, 2020, S.B. reminded defendant SAFFRON that defendant SAFFRON had agreed to pay S.B. fourteen (14) Bitcoin on or about August 9, 2020 for the $140,000 in services rendered by S.B.'s business to defendant SAFFRON.

67.   In response to defendant SAFFRON's solicitations for S.B. to invest in defendant SAFFRON's 11-client fund, S.B. asked whether defendant SAFFRON would invest the 14 Bitcoin defendant SAFFRON owed to S.B. into defendant SAFFRON's fund.

68.   On or about September 19, 2020, defendant SAFFRON confirmed that defendant SAFFRON would put the 14 Bitcoin that defendant SAFFRON owed to S.B. into defendant SAFFRON's 11-client fund, and defendant SAFFRON would pay S.B. a 150% return by no later than October 20, 2020.

69.   Defendant SAFFRON did not pay victim-investor S.B. on October 20, 2020, as promised or at any time thereafter.  Instead, after fraudulently causing S.B. to invest in defendant SAFFRON's fund and Cloud9Capital, defendant SAFFRON misappropriated victim investor S.B.'s funds for defendant SAFFRON's own personal use and benefit.

1                         FORFEITURE ALLEGATION

2             [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

3        70.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States of America

5   will seek forfeiture as part of any sentence, pursuant to Title 18,

6   United States Code, Section 981(a)(1)(C) and Title 28, United States

7   Code, Section 2461(c), in the event of defendant DAVID GILBERT

8   SAFFRON's conviction of any of the offenses set forth in any of

9   Counts One through Five of this Indictment.

10        71.   Defendant SAFFRON, if so convicted, shall forfeit to the

11   United States of America the following:

12             a.   all right, title, and interest in any and all

13   property, real or personal, constituting, or derived from, any

14   proceeds traceable to the offenses set forth in Counts One through

15   Five of this Indictment; and

16             b.   to the extent such property is not available for

17   forfeiture, a sum of money equal to the total value of the property

18   described in subparagraph (a).

19        72.   Pursuant to Title 21, United States Code, Section 853(p),

20   as incorporated by Title 28, United States Code, Section 2461(c),

21   defendant SAFFRON, if so convicted, shall forfeit substitute

22   property, up to the value of the property described in the preceding

23   paragraph if, as the result of any act or omission of defendant

24   SAFFRON, the property described in the preceding paragraph or any

25   portion thereof (a) cannot be located upon the exercise of due

26   diligence; (b) has been transferred, sold to, or deposited with a

27   third party; (c) has been placed beyond the jurisdiction of the

28   court; (d) has been substantially diminished in value; or (e) has

                                     21

1  been commingled with other property that cannot be divided without

2  difficulty.

3

4                                              A TRUE BILL

5

6                                              _____/S/_____

7                                              Foreperson

8  TRACY L. WILKISON
   United States Attorney

9

10

11  SCOTT M. GARRINGER
    Assistant United States Attorney

12  Chief, Criminal Division

13  RANEE A. KATZENSTEIN
    Assistant United States Attorney

14  Chief, Major Frauds Section

15  JAMES C. HUGHES
    Assistant United States Attorney

16  Major Frauds Section

17  LORINDA I. LARYEA
    Acting Chief, Fraud Section

18  Criminal Division
    United States Department of

19  Justice

20  KEVIN LOWELL
    Trial Attorney, Fraud Section

21  Criminal Division
    United States Department of

22  Justice

23  THEODORE KNELLER
    Trial Attorney, Fraud Section

24  Criminal Division
    United States Department of

25  Justice

26

27

28